## UNITED STATES v. SEARS, ROEBUCK & CO. et al.

United States District Court
S. D. New York.
April 28, 1953.

more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,-.000, engaged in whole or in part in commerce, * * * if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. * * *"

The following facts are admitted by defendants: that Sears, Roebuck & Company (hereafter called Sears) and The B. F. Goodrich Company (hereafter called Goodrich) are New York corporations of the required size; that the defendant Sidney J. Weinberg (hereafter called Weinberg) has been for many years, and now is, a director of both Sears and Goodrich; that each corporation is engaged in commerce as the term is used in the Clayton Act; that they are competitors in the sale of the following items at retail in commerce as the term is used in the Clayton Act: (1) refrigerators, washers, stoves and other home appliances; (2) hardware; (3) automotive supplies; (4) sporting goods; (5) tires, tubes and recaps; (6) radios and television sets; (7) toys.

The defendants further admit that Sears and Goodrich are competitors in the sale of the aforesaid seven categories of items in 97 communities located in 31 states of the United States through 110 retail stores of Sears and 112 retail stores of Goodrich, located in the same communities; that for 1951, the approximate total annual dollar volume of sales of the said items by Sears' 110 retail stores in the 97 communities was in excess of $65,000,000, and the approximate total annual dollar volume of sales of the same items by Goodrich's 112 stores in the 97 communities was in excess of $16,000,000; and that for 1951, the approximate average annual dollar volume of sales of each of the seven items per each Sears store was $592,000, and per each

Myles J. Lane, U. S. Atty., New York City, for plaintiff. Richard B. O'Donnell, New York City, John T. Duffner, Sp. Assts. to Atty. Gen., Allen A. Dobey, Donald F. Melchoir, Francis J. Heazel, Jr., Washington, D. C., trial attorneys, U. S. Department of Justice.

Sullivan & Cromwell, New York City, for defendants. Edward H. Green, Howard T. Milman, James A. Thomas, Jr., New York City, of counsel.

WEINFELD, District Judge.

Plaintiff moves for summary judgment in an action seeking inter alia an order directing the resignation of the individual defendant as a director of one or both of the corporate defendants because he is alleged to be an interlocking director in violation of § 8 of the Clayton Act, 38 Stat. 733, as amended, 15 U.S.C.A. § 19.

The relevant portion of § 8* provides:

"* * * No person at the same time shall be a director in any two or

* The references to § 8 appearing in this opinion refer, unless otherwise indicated, to the quoted portion of that section.

Goodrich store was $145,000 in each of the aforesaid 97 communities.

The basic issue presented for decision under the admitted facts is whether Sears and Goodrich are "competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws." If so, then § 8 forbids Weinberg to be a director of both. The case is one of novel impression involving the first construction of this section of the Clayton Act since its passage in 1914.

Defendants in substance contend that the clause just quoted severely limits the scope of the prohibition upon interlocking directorates; that it requires a finding that a hypothetical merger between the two corporations would violate the antitrust laws before the same director is forbidden them; that plaintiff has not demonstrated that the combined position of the two corporate defendants in the sale of the particular commodities is such that there is a "reasonable probability that they could together substantially restrain trade or create a monopoly" and that, therefore, the plaintiff cannot succeed since a merger would not be violative of the antitrust laws without such a showing. In essence, the defendants would apply the merger test as spelled out in § 7 of the Clayton Act, 15 U.S.C.A. § 18.

The plaintiff urges to the contrary that "a violation of any of the provisions of any of the antitrust laws" is not limited to a merger or acquisition situation; that it includes agreements to fix prices or divide markets; that such agreements are illegal per se; and that, therefore, Sears and Goodrich may not retain in their service the same director since an agreement between them to fix prices or to divide territories would constitute a per se violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1.

The Senate and House Reports on the various proposals antecedent to the passage of § 8 of the Clayton Act and the Congressional Debates shed little light on the precise point at issue. However, the broad purposes of Congress are unmistakably clear. Section 8 was but one of a series of measures which finally emerged as the Clayton Act, all intended to strengthen the Sherman Act, which, through the years, had not proved entirely effective. Congress had been aroused by the concentration of control by a few individuals or groups over many gigantic corporations which in the normal course of events should have been in active and unrestrained competition.[1] Instead, and because of such control, the healthy competition of the free enterprise system had been stifled or eliminated. Interlocking directorships on rival corporations had been the instrumentality of defeating the purpose of the antitrust laws. They had tended to suppress competition or to foster joint action against third party competitors. The continued potential threat to the competitive system resulting from these conflicting directorships was the evil aimed at. Viewed against this background, a fair reading of the legislative debates leaves little room for doubt that, in its efforts to strengthen the antitrust laws, what Congress intended by § 8 was to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates.[2] The legislation was essentially preventative.

It is in the context of this history that defendants' argument must be evaluated. They argue that to read the "so that" clause as the government urges does violence to the language of § 8. They say that the application of the per se rule to the "so that" clause renders it meaningless since § 8 minus the clause would still bring about the result contended for by the government.

1. Report of the Committee on the Judiciary to accompany, H.R. 15657, May 6, 1914 (63d Cong., 2d sess., H.Rep. 627).

2. Senate Report No. 698 (63d Cong., 2d sess.). Cf. Federal Trade Commission v. Motion Picture Adv. Co., 344 U.S. 392, 394–395, 73 S.Ct. 361; Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 464, 61 S.Ct. 703, 85 L.Ed. 949; Trade Commission v. Cement Institute, 333 U.S. 683, 692, 68 S.Ct. 793, 92 L.Ed. 1009.

■ I do not think this argument is valid. While it may be acknowledged that the clause is not crystal clear, to infuse it with the meaning contended for by the defendants would defeat the Congressional purpose "to arrest the creation of trusts, conspiracies and monopolies in their incipiency and before consummation."[3] This conclusion is compelled because of the futility of trying to decide whether a given hypothetical merger would violate the pertinent sections of the antitrust laws.[4] Such a decision would involve a consideration of many factors, not the least important of which is "whether the action [viz., the contemplated merger] springs from business requirements or purpose to monopolize".[5] These factors can be applied only in an actual case and not in a hypothetical situation. Thus, the Court in applying to the "so that" clause the merger test contended for by the defendants, would, amongst other items, have to analyze the intent and motivation of those who are hypothetically undertaking the merger. Obviously this could be done only if the corporations involved were actually, and not hypothetically, contemplating merger, for the nature of one's purpose in doing an act cannot be determined unless he, in fact, intends to do it. The Court would be called upon to determine the nature of a non-existent purpose. This difficulty suggests that the merger test would result in complete nullification of the law prohibiting interlocking directorates in all but the rawest situation, as where, for example, the two corporations concerned had between them the entire business in their field in the United States and it was clear that no valid business requirement could warrant a hypothetical merger. The government's position presents no such difficulty. To accept its workable per se test, instead of the defendants' alternative, permits the

prohibitory features of § 8 to be administered with the full scope which the legislators must have contemplated.

Nor does the use of this test render the "so that" clause meaningless, as defendants urge. Stripped of the clause, § 8 would in essence read as follows:

"* * * No person at the same time shall be a director in any two or more corporations * * * engaged in whole or in part in commerce, * * * if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors."

By its terms, such a provision would forbid an interlocking directorate to corporations engaged partially in interstate commerce and partially in intrastate commerce, even if they were competitors solely in intrastate commerce. It would involve the Constitutional problem as to whether Congress had the power to forbid a common director to corporations which were purely intrastate competitors solely on the basis of their engaging, but not competing with each other, in interstate commerce. It is the "so that" clause which precludes such an interpretation and, hence, such a problem by requiring that the corporations compete with each other in interstate commerce before the prohibitory features of § 8 apply.

Thus, the clause covers the type of situation involved in Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 247–248, 20 S.Ct. 96, 109, 44 L.Ed. 136, where the Supreme Court held the injunction granted by the court below to be too broad because it could be construed as applying to "commerce wholly within a state" and "modified and limited [it] to that portion of the combination or agreement which is interstate in its character."[6]

3. Senate Report No. 698 (63d Cong., 2d sess.).

4. Defendants point out that a merger might be violative of §§ 1, 2 and 3 of the Sherman Act and § 7 of the Clayton Act.

5. United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533.

6. Defendants argue that if Congress had intended this to be the meaning of the "so that" clause, it would have said so in far plainer language. The difficulty is that the same objection could be made to defendants' version; that is, Congress need only have inserted the words "of merger" so that the clause would have

Defendants assert that the legislative history supports their contention that the "so that" clause is to be given restricted application. They point to no committee report of either the House or the Senate to uphold their position. They do, however, rely upon a statement made by Senator Cummins of the Committee on the Judiciary[7] during the course of the debates. In urging the inadequacies of § 8, on August 26, 1914, he said with particular reference to the "so that" clause:[8]

> "That means, practically, that if a consolidation of the corporations would be a violation of the antitrust laws, then interlocking directors are made unlawful."

No member of the Senate stated his agreement or disagreement with Senator Cummins' apparent belief that a consolidation was the only means by which competition might be eliminated within the meaning of § 8.

On September 1, 1914, he offered the following amendment in its stead:[9]

> "It shall be unlawful for any person to be, at the same time, a member of the board of directors, or other managing board, or an officer of two or more corporations, either of which is engaged in commerce, and which corporations are carrying on business of the same kind or competitive in character: *Provided*, That this paragraph shall not apply to banks, banking institutions, or common carriers."

This amendment was defeated on the day of its introduction by 44 to 15 with 37 not voting.[10] We can, therefore, do no more than speculate as to whether or not it was the sense of Congress that § 8 invoked only the consolidation test.

It must be borne in mind that Senator Cummins deemed the proposed § 8 woefully inadequate, "a half hearted and feeble way" to meet the menace of interlocked directorships, and was placing his own interpretation upon it to emphasize what he considered its shortcomings to win support for his amendment.[11] His proposal was far more drastic. It eliminated the million dollar requirement so that corporations of any size would come within its prohibition; it proscribed interlocked officers as well as interlocked directors; it also covered competitor corporations, irrespective of their location, and came into play even if only one of the corporations was engaged in interstate commerce.

Are we to infer from the amendment's rejection that the Senate agreed with Senator Cummins' interpretation, expressed five days earlier, and acted as it did because it intended the section to apply only the consolidation test? We might with equal reason infer that his interpretation was not in accord with the understanding of the other Senators, that they did not see the difficulty he saw and that they, therefore, rejected his amendment because they saw no need for it.

These possibilities assume that rejection of the amendment turned on the question of the consolidation test. It is just as likely that the Senate found to be decisive one or more of the substantial differences between what was to become § 8 and the proposed amendment with its far more drastic provisions.

It is also to be observed that no member of the House supported the position of Senator Cummins. And not to be overlooked is the fact that President Woodrow Wilson had given leadership to the move to strengthen the Sherman Act. His strong views on the need to curb the evils of interlocking directorates had been the sub-

---

read, "the elimination of competition between them by agreement *of merger* would constitute a violation * * * of the antitrust laws." (Emphasis supplied.)

**7.** Defendants also rely on a bill earlier introduced as to interlocking directorates which was not enacted. But failure to

enact this provision casts no light whatever on the meaning of the clause in question.

**8.** 51 Cong.Rec. 14256.

**9.** 51 Cong.Rec. 14534.

**10.** 51 Cong.Rec. 14543.

**11.** 51 Cong.Rec. 14256, 14535–14537.

ject of messages to the Congress.[12] The provision prohibiting interlocked directorates was included in the Clayton Act in response to his specific request.[13] Is it to be implied on the sole basis of the statement made during the course of a debate on the bill that the President in signing it intended to approve a restricted, rather than a comprehensive, law to meet the problem about which he had such decided views?

Senator Cummins was in the role of an advocate. His individual expression of views, clearly calculated to give weight to his contention as to the inadequacies of the proposed § 8 and to gain support for his amendment, may not be considered as representative of the understanding of the members of the House and Senate as to the meaning of the "so that" clause. It seems to me, therefore, that the legislative history of § 8 is inconclusive on the precise question before me. It affords no evidence permitting progress from speculation toward certainty.

It may not be amiss to direct attention to the admonition of Mr. Justice Jackson in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395–396, 71 S.Ct. 745, 751, 95 L.Ed. 1035:

"Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared. * * * [T]o select casual statements from floor debates, * * * as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions. * * Moreover, it is only the words of the bill that have presidential approval, where that approval is given. It is not to be supposed that, in signing a bill the President endorses the whole Congressional Record. * *. * "[14]

Defendants also rely on the asserted necessity for reading § 8 in connection with § 7 of the Clayton Act, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U.S.C.A. § 18, which deals with mergers and interdicts the acquisition by one corporation of the stock or the assets of another where the effect of such acquisition "may be substantially to lessen competition, or to tend to create a monopoly."

Defendants argue, as set forth above, that § 8 does not prohibit defendant Weinberg's directorship on the two Boards, absent a showing that the effect of an assumed consolidation between Sears and Goodrich "may be substantially to lessen competition, or to tend to create a monopoly", as set forth in § 7. The vital distinction between § 7 and § 8, however, is that the latter omits the § 7 test and promulgates its own substantiality standard in the form of the one million dollar size requirement. The omission of "substantially to lessen competition, or to tend to create a monopoly" from § 8 in contradistinction to its inclusion in § 7 and other sections of the same Act[15] may not be deemed inadvertent. Were the defendants' construction to be adopted, it would require the application under § 8 of a test which Congress appears deliberately to have omitted.[16]

12. Message to the Congress, January 20, 1914, Woodrow Wilson Life and Letters, Ray Stannard Baker, Vol. 4, pp. 369–371.

13. As to the use of Presidential messages to aid in determining the general purpose of statutes enacted in response to such request, see New York Central R. R. Co. v. Winfield, 244 U.S. 147, 149–150, 37 S.Ct. 546, 61 L.Ed. 1045; Johnson v. Southern Pacific Co., 196 U.S. 1, 19, 25 S.Ct. 158, 49 L.Ed. 363; Shapiro v. United States, 335 U.S. 1, 8, 68 S.Ct. 1375, 92 L.Ed. 1787.

14. See also on the subject of analysis of statutes and legislative history the con-

curring opinion of Mr. Justice Jackson in United States v. Public Utilities Comm., 73 S.Ct. 706; 52 Columbia L.Rev. 125.

15. §§ 2 (price discrimination) and 3 (tying clauses) of the Clayton Act, 38 Stat. 730, 731, 15 U.S.C.A. §§ 13, 14.

16. Defendants also advert to paragraphs 1 and 2 of § 8, which, in clear language, prohibit interlocking bank directorates without limitation. They say that because the language of ¶3 of § 8 (the provision under consideration) does not contain a similar clarity, it could not have been intended that its prohibition was

■ Further, the defendants' construction would denude of meaning the phrase "*any* of the provisions of *any* of the antitrust *laws*." (Emphasis supplied.) This language is broad enough to cover all methods of violating antitrust legislation. At the time of the passage of § 8, price fixing and division of territory agreements were in common use to effect such violations. Merger or acquisition was not the sole means used to achieve this result. There is no logical basis upon which to infer that the all-inclusive language was intended to exclude the other known methods from the reach of § 8.

■ Finally, defendants urge that no policy reasons have been advanced to show that the public interest is affected by the dual directorship of the defendant Weinberg on the Boards of the corporate defendants. They say that the government has failed to show that there exists between Sears and Goodrich any agreement fixing prices, restricting territories or otherwise restraining competition between them or that there is a likelihood of any such agreement; further, that no contention is made that the individual defendant's dual directorship has had the effect, or has the potentiality, of restraining competition. But this argument ignores the preventative nature of § 8. The instant case presents a good example of what the section was intended to avert.

■ The defendants have conceded that they are competitors in the sale of the seven categories of items at retail in commerce as the term is used in the Clayton Act. The sales of the seven items in the 97 communities amounted to $80,000,000 for 1951. The fact that this volume of sales may represent but a small percentage of either or both of the corporate defendants' annual sales, or a fraction of the annual retail sales volume of all distributors in the country of those commodities, does not militate against the undesirability of directorates common to both corporations. Actually, commerce in a particular product, using refrigerators as an example, while perhaps insignificant as related to the corporate defendants' total sales of all their other products or infinitesimal compared to the national retail volume, may, nonetheless, represent the total absorptive capacity of a given community within which they are competitors.

Assume that Sears and Goodrich are selling refrigerators competitively in a town of 30,000 population, the effective and easy means is at hand, through a price fixing agreement or the withdrawal of either Sears or Goodrich from the territory or an agreement not to sell the refrigerators in the same area, to eliminate or lessen competition. While the government does not charge that any such agreement has here been made or is contemplated, a director serving in a dual capacity might, if he felt the interests of an interlocking corporation so required, either initiate or support a course of action resulting in price fixing or division of territories or a combination of his competing corporations as against a third competitive corporation. The fact that this has not happened up to the present does not mean that it may not happen hereafter.

■ In summary, an agreement between Sears and Goodrich which fixed the prices at which they would sell the seven categories of items would eliminate competition,[17] as would an agreement by which they allocated as between themselves the territories in which they would sell those items.[18] Price fixing and territorial di-

---

likewise without limitation. A distinction is readily apparent, considering that the banks are organized under the laws of the United States, whereas the corporations are created by the states. Further, I do not believe that I should read a limitation into the Act on such a tenuous basis when to do so would defeat the general purpose of Congress in enacting the prohibition.

17. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218–222, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Trenton Potteries Co., 273 U.S. 392, 397–398, 47 S.Ct. 377, 71 L.Ed. 700.

18. United States v. Imperial Chemical Industries, D.C.S.D.N.Y., 100 F.Supp. 504, 593.

vision between competitors are per se violations of § 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1, without regard to the amount of commerce affected.[19] No showing of industry domination is required. It is the character of the restraint and not the amount of commerce affected that taints the transactions.

"* * * [I]t is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy." [20]

Surely the sales of $80,000,000 do not come within the de minimis principle.

Since Sears and Goodrich are competitors, since a price fixing or division of territory agreement would eliminate competition between them, and since such an agreement would per se violate at least one "of the provisions of * * * the antitrust laws", namely § 1 of the Sherman Act, it follows that § 8 forbids defendant Weinberg to be a director of both corporations.

The government's motion for summary judgment is granted. Settle order on notice.

19. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 427; United States v. Imperial Chemical Industries, D.C., 100 F.Supp. 504, 592–593.

20. United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 1564, 91 L. Ed. 2010.