**AMERICAN MEDICORP, INC., Plaintiff,**

v.

**HUMANA, INC., Defendant.**

Civ. A. No. 77–3392.

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1977.

Thomas A. Masterson, William J. Taylor, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff; Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel.

Lee Calligaro, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendant; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.

## OPINION AND ORDER

FOGEL, District Judge.

A tender offer has detonated a series of actions that exploded first in the Southern District of New York, next in the Eastern District of Pennsylvania, and then in the Northern District of Illinois. The initial fall-out in this court has produced several critical motions, one of which raises major issues of first impression.

The chronology of events, which is seminal to the adjudication of this matter, follows:

(1) On September 27, 1977, Humana, Inc. (Humana), sent a letter to the Board of Directors of American Medicorp, Inc. (Medicorp), which announced Humana's proposed offer to Medicorp shareholders. The Board responded by issuing two statements on September 29, 1977;

(2) On September 30, 1977, Humana filed a complaint in the Southern District of New York, alleging that Medicorp's press releases were fraudulent and manipulative acts in violation of the Securities Exchange Act of 1934, (*Humana, Inc. v. American Medicorp, Inc.*, 77 Civ. 4809, assigned to the Honorable Morris E. Lasker);

(3) On October 3, 1977, Medicorp began this action by filing a complaint which stated a claim for violation of the federal antitrust laws, a second claim for violation of the West Virginia "cornering the market" law, and asked for a preliminary injunction to block the tender offer;

(4) Three days later, on October 6, 1977, Medicorp filed a Motion for Leave to Amend the Complaint. The proposed amended complaint which was attached to that motion repeated the claims of the original complaint, and added five claims founded on purported violations of federal and state securities laws and state fiduciary principles;

(5) Following a pre-trial conference, on October 12, 1977, we issued an Order which set a schedule for briefs, oral argument and a hearing on the application for the preliminary injunction. Pursuant to that Order, Humana filed a brief on October 17, 1977, and Medicorp filed its briefs on October 19 and 20, 1977;

(6) On October 13, 1977, Humana filed a Motion to Transfer to the Southern District of New York, a Motion to Dismiss for Improper Venue, a Motion to Dismiss for Failure to State a Claim, and, in the alternative, a Motion for a More Definite Statement;

(7) On that same day, we entered an Order granting expedited discovery with priority for that discovery which was necessary to prepare for argument of the venue motions;

(8) On October 18, 1977, we entered a second discovery Order which spelled out the method for handling confidential materials;

(9) On October 21, 1977, counsel engaged in extensive oral argument of all the motions before the court;

(10) Both parties then filed supplemental briefs on October 25 and 26, 1977;

(11) On October 28, this Court entered an Order disposing of all pending Motions as follows: (a) defendant's Motion to Dismiss was denied as to the federal antitrust claims, but granted with respect to the West Virginia "cornering the market" claim; (b) the alternative Motion for a More Definite Statement was denied; (c) the Motion for Transfer was granted as to all securities laws claims (both federal and state), and denied as to the antitrust and breach of fiduciary duties claims; (d) the Motion to file an amended complaint was denied for mootness;

(12) Humana then moved the Court to reconsider retaining the *Sixth Claim*, which the parties argued before this Court on November 7, 1977;

(13) We granted the Motion to Reconsider that same day, and transferred the *Sixth Claim*, together with pertinent parts of the *Eighth Claim*, to the Southern District of New York.

All parties agreed that a tight time table was critical and therefore at our scheduling conference, which was held on October 12, 1977, we not only set the deadline for briefing and arguing the motions, but also the date for commencement of the hearing for preliminary injunction sought by Medicorp to stop the tender offer. Since these hearings were scheduled to begin on November 7, 1977, we entered our Order on October 28, 1977, so that the parties could properly prepare for that hearing, which in fact began on November 8, 1977. We noted in that Order that this opinion would follow. We believe that the novelty of some of the issues, as well as the fact that multiple actions are still pending in the various jurisdictions, including the transferee district, the Southern District of New York, call for a statement of the factors which prompted us to decide the motions as we did. Our reasons follow.

---

1. Plaintiff actually has not filed an amended complaint, but only a proposed copy attached to the motion seeking leave to amend; in order to expedite matters, we will consider that proposed copy to be the amended complaint with the same force and effect as if filed with the

## I. MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

█ Plaintiff filed the original complaint on October 3, 1977. A Motion for Leave to File an Amended Complaint was filed three days later on October 6, 1977. In the interim, defendant had served its motions to dismiss and to transfer. Plaintiff now argues, by its supplemental brief filed on October 25, 1977, that its original motion to amend was erroneously filed by plaintiff's previous counsel. Hence, it has reversed its position, and now asserts that it may amend the complaint as of right because as of that date there was no answer filed, but only a motion to dismiss, which is not a responsive pleading within the meaning of F.R.C.P. 15(a). A recent Eastern District case directly supports this contention. In *Drennon v. Philadelphia Hospital*, 428 F.Supp. 809 (E.D.Pa.1977), our former colleague, Judge Higginbotham, now of the Court of Appeals for the Third Circuit, held that plaintiff did not need the permission of the court to submit an amended complaint filed in response to defendant's motion to dismiss. See also *Kelly v. Delaware River Joint Comm'n*, 187 F.2d 93, 94 (3rd Cir. 1951). Defendant has not disputed plaintiff's right to file an amended complaint without the permission of the court, (Letter of Defendant's Counsel, October 26, 1977). Accordingly, (notwithstanding the reams of paper, argument and time spent on this issue), we will deny that Motion for mootness, and rule on the remaining motions on the basis of the amended complaint.[1]

## II. MOTION TO DISMISS FOR IMPROPER VENUE

█ Defendant contends that its activities in this district are not sufficient to establish venue under either Section 12 of the Clayton Act, 15 U.S.C. § 22 (Section 12) or Section 1391(b) of the general venue statute, 28 U.S.C. § 1391(b). Section 12 reads as follows:

Clerk's office, sans motion. By the same token, although the parties have not filed complete consolidated briefs addressing all claims in the amended complaint, we have read the motions relating to the venue issues on the basis of the allegations therein.

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

Section 1391(b) provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

Plaintiff contended in its briefs that this "claim arose" in the Eastern District because plaintiff will be injured in its business in Bala Cynwyd, the location of its corporation headquarters, thus satisfying the venue requirements of 1391(b). Plaintiff also asserted that venue was proper under Section 12 because defendant has transacted business in this district through such acts as: (1) purchases of medical supplies, (2) advertisements in journals which circulate here, (3) recruitment of personnel, (4) attendance by its personnel at business meetings, and (5) preparation of the tender offer itself. At oral argument, plaintiff shifted its emphasis, and urged that defendant's compliance with the Pennsylvania Takeover Disclosure Law, 70 P.S. §§ 71–85, Supp.1977, including its appearance before the Pennsylvania Securities Commission (PSC), and all of its other efforts in this jurisdiction designed to achieve its goal of a successful tender offer were sufficient, in and of themselves, to establish venue. (Tr. at 75, 69–70). By resting on this prong of its contention,[2] plaintiff asks us to decide a question not previously addressed, to our knowledge, by any other federal court in any reported opinion.

In determining whether Humana's activities within this district are sufficient to establish venue, we will be guided by the Congressional purpose underlying Section 12 of the Clayton Act. *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). The Supreme Court has construed Section 12 as broadly expanding venue in antitrust litigation

. . . by relieving the injured person from the necessity of resorting for the redress of wrongs committed by a nonresident corporation, to a district, however distant, in which it resides or may be 'found'—*often an insuperable obstacle— and enabling him to institute the suit in a district, frequently that of his own residence, in which the corporation in fact transacts business*, and bring it before the court by the service of process in a district in which it resides or may be 'found'. *United States v. National City Lines*, 334 U.S. 573, 579–580, 68 S.Ct. 1169, 1173, 92 L.Ed. 1781 (1947), quoting *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373–374, 47 S.Ct. 400, 71 L.Ed. 684 (1927). (Emphasis supplied).

In place of the former highly restrictive definition of being "found" in a district, Section 12 substituted "the practical everyday business or commercial concept of doing business or carrying on *business 'of any substantial character'*," as the standard. (Emphasis added). *Scophony, supra*, 333 U.S. at 807, 68 S.Ct. at 862.

The first question, therefore, is whether this district would be the appropriate forum if Medicorp had waited until the tender offer was a *fait accompli*, with the

**2.** The recruitment visits, ads, letters, and attendance at industry meetings are clearly de minimis contacts, and lack merit as a basis for establishing venue. See *Latch String. Inc. v. Rouse Co.*, 1977–1 Trade Cas. ᶜ 61,235 (D.D.C. 1977). Medicorp has also provided a list of companies with Philadelphia addresses which appear on Humana's computer printouts as suppliers. Humana contends that the list of suppliers has no probative value, because the address of a company's home office does not reveal whether or not the actual business transaction occurred in this district. When asked by the Court whether additional discovery would be necessary to determine the extent of these contacts, plaintiff's counsel denied their importance in determining this issue. This Court, therefore, can only conclude that plaintiff has not demonstrated an adequate foundation for venue on the basis of Humana's acts and contacts with this jurisdiction which are unrelated to the tender offer.

result that the antitrust claims would then have had to have been raised, if at all, in a derivative action by the remaining "Medicorp" shareholders. *If the acquisition of corporate assets by means of a tender offer accomplishes the same result as more traditional forms of purchase, then it must be given the same effect in applying the "everyday business concept" standard for transacting business.* Medicorp possesses substantial assets within Pennsylvania and this district: it owns the Parkview Hospital, and manages St. Mary's Hospital, both located in Philadelphia (SEC FORM S–7 at 61); its corporate headquarters is located in Bala Cynwyd, Montgomery County, also within this district; estimated aggregate assets of at least $75,000,000 are located in Pennsylvania, (testimony of Mr. Kline, PSC staff, Transcript of PSC Hearing, October 19, 1977, at 34); and, of this total, at least $23,000,000 in assets are deposited in Philadelphia banks (testimony of Mr. Harvey, Id. at 25). A direct purchase of these assets would clearly amount to Humana's engaging in *"substantial business operations,"* [3] (emphasis supplied), 333 U.S. at 807, 68 S.Ct. 855, in this district.

■ In applying Section 12, this court must open its eyes to the dynamics of change in business techniques and not be blinded by outmoded technical concepts. *Scophony, supra,* 333 U.S. at 809, 68 S.Ct. 855. The creativity of our economic system is continually spawning new business methods. We must take cognizance of the progeny produced, and fashion solutions which are capable of dealing with these offspring. Certainly, nothing in the legislation or its history supports the notion that Congress in 1914 contemplated that business would always be conducted as it was then. Indeed, the very impetus that led to passage first of

the Sherman Act, and later the Clayton Act were the vast changes that had occurred in the conduct of business in the last part of the Nineteenth and first part of the Twentieth centuries. The Clayton Act was intended to provide the courts with a new kit of tools. Our mandate is to adapt those tools to do the job as changed methods, practices and techniques evolve. The purchase of a sufficient number of shares to effectuate a merger by means of a tender offer is a rapidly developing new technique for corporate expansion. See *Hearings before the Senate Committee on Banking, Housing and Urban Affairs on Regulation Under Federal Banking and Securities Laws of Persons Involved in Corporate Takeovers, February 16, 1976, p. 71.* The practical effect of the tender offer, according to the stated intentions of the purchaser (SEC FORM S–7 at 16), is identical to the results of an outright purchase of assets. Therefore, the tender offer must be given the same legal effect under Section 12. The completion of a successful tender offer would transfer control of substantial assets in this district to Humana, and accordingly would establish venue here.[4]

Section 12, however, refers to a district *in which defendant transacts business, and not one in which it prospectively will transact business.* The ensuing question, therefore, is whether venue is established by demonstrating that the feared future activities, which in and of themselves, if conducted, as alleged antitrust violations, would be sufficient for venue, are a basis for venue in this matter. Neither the parties nor the Court has found any case which sheds light on this question which appears to be a matter of important first impression.

■ We believe on balance there is a compelling argument for finding that venue

---

**3.** Substantial purchases are sufficient to establish Section 12 venue, even if those purchases are unrelated to the antitrust claims. *Crusader Marine Corp. v. Chrysler Corp.,* 281 F.Supp. 802 (E.D.Mich.1968). Courts in this district have adopted the reasoning underlying that decision. *Eastern Pre-Cast Corp. v. Giant Portland Cement Co.,* 311 F.Supp. 896 (E.D.Pa. 1970); *Philadelphia Housing Authority v.*

*American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252 (E.D.Pa.1958).

**4.** We note that defendant not only would have transacted business through the success of its tender offer, but would also continue to transact business here by reason of its acquisition of Parkview and St. Mary's Hospital, currently operated by Medicorp.

exists under these circumstances, if we are to give full effect to the purposes of § 16 of the Clayton Act, 15 U.S.C. § 26, and Section 12. As the Supreme Court stated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

[Section] 16 of the Clayton Act, 15 U.S.C. § 26, . . . was enacted by the Congress to make available equitable remedies previously denied private parties, . . . and authorizes injunctive relief upon the demonstration of "threatened" injury . . . [for which one] need only demonstrate a significant threat of injury from an impending violation of the antitrust laws . . . .

Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but *was to serve as well the high purpose of enforcing the antitrust laws.* (Citations omitted) (Emphasis added) 395 U.S. at 130–131, 89 S.Ct. at 1580.

This statement of the purpose of Section 16 is particularly apposite to the tender offer technique, which, if successful, presents insurmountable obstacles in fashioning after-the-fact remedies that often result in throwing out the baby with the bath water—or to use a more felicitous metaphor we quote Judge Prentice H. Marshall in *Chemetron Corp. v. Crane Co.*, N.D. Ill., No. 77 C 2800, September 8, 1977:

[T]he difficulty, if not the impossibility of "unscrambling the scrambled eggs" if plaintiff should prevail on the merits or if a subsequent government action results in an order of divestiture, requires the protection which plaintiff seeks here by way of preliminary injunction. *Chemetron Corporation v. Crane Co.*, (N.D. Ill., September 8, 1977) Slip op. at 19–20.

See also, *Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 851 (3rd Cir.), *cert. denied* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). Courts time and again have demonstrated the inability to "un-

scramble" without a party or parties suffering grave financial harm because the chain of circumstances after the fact are such that reconstruction of the *status quo ante* cannot be achieved. Indeed, the very difficulties which dismemberment presents points up the wisdom of the use of the power granted by § 16. A reading of Sections 12 and 16 in a manner which gives effect to the purposes of each is particularly compelling in this matter, when the scope of Humana's current corporate activities in this district in furtherance of the proposed tender offer is analyzed.[5]

In addition to the preparation of a tender offer directed (in part) to residents, Humana has done the following acts in this district to further its success in this regard:

1. On September 27, 1977, Humana sent a letter to Medicorp's Board of Directors in Bala Cynwyd asking for the Board's cooperation and requesting a shareholder's list when the tender offer was made.

2. Humana has complied with the Pennsylvania Takeover Disclosure Law by submitting documents to the Pennsylvania Securities Commission. Humana requested both general and specific exemptions to the disclosure law, which were denied following a hearing on October 19, 1977.

3. Humana placed an advertisement in the Philadelphia Bulletin on October 7, 1977, announcing the terms and conditions of the tender offer. (Affidavit of John B. Bartlett, Vice President and General Counsel of American Medicorp).

Defendant contends that its activities are no more than "a few isolated and peripheral contacts" in contrast to those of a "substantial character" required by Section 12. *Eastern Pre-Cast, supra,* 311 F.Supp. 896, 898. A determination of the substantiality of these contacts turns upon the breadth and depth of their business impact. See

---

5. See *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ginsberg & Sons v. Pop-* *kin*, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932).

*Scophony, supra,* 333 U.S. at 807, 68 S.Ct. 855. The attempt to gain the cooperation of Medicorp's Board, to gain access to its shareholder lists, to file required documents with the PSC, to advertise the offer for local shareholders are all significant and purposeful steps taken to arrive at Humana's goal. Indeed, some are even mandated by Pennsylvania law. These acts acquire their "substantial character" by being necessarily and causally connected with the undoubtedly substantial transaction of acquiring control of Medicorp by means of a tender offer. *In viewing Humana's action as a whole in the context of contemporary acquisition techniques, we hold, that in fact, defendant is currently transacting business in the Eastern District of Pennsylvania within the meaning of Section 12.* See *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' and Exhibitors' Association of America,* 344 F.2d 860, 865 (9th Cir. 1965).

▮▮▮▮ The purchase of the shares at the conclusion of the tender offer is not only a *substantial* transaction, but is also an *allegedly illegal* act as part of the *purportedly illegal* scheme to merge with Medicorp. A weighty factor in deciding substantiality of contact within a forum is the relationship of acts performed to the cause of action which is asserted.[6] *Courtesy Chevrolet, supra,* 344 F.2d at 865–866; *Pacific Tobacco Corp. v. American Tobacco Co.,* 338 F.Supp. 842 (D.Ore. 1972). *When a complaint charges a defendant with future acts which will result in violation of the antitrust laws if successful, and therefore would at that point establish venue in a district, then it is our view that the activities of defendant to substantially further the alleged antitrust violations are sufficient to create venue under Section 16 of the Clayton Act.*

## III. MOTION TO TRANSFER

▮▮▮▮ Although defendant vigorously contends that dismissal of the action is clearly warranted, it argues, in the alternative, that transfer of the matter pursuant to 28 U.S.C. § 1404(a) is mandated, at the very least, for the following reasons: (1) pendency of an action filed by Humana in the Southern District of New York with respect to the tender offer; (2) substantial contacts of both parties with the New York forum, by reason of the location of the principal places of business of board members, bankers, attorneys, and stock registrars in that jurisdiction, (in sharp contrast to an absence of substantial Humana contacts in Philadelphia); (3) presence of witnesses in New York whose testimony is critical with respect to the events which are pertinent to the securities claims contained in the amended complaint; and (4) absence of any operative events in Philadelphia.

Title 28 U.S.C. § 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

We have construed this section in previous cases, and have identified two distinct determinations a court must make in ruling on a motion to transfer. *Azriel v. Frigitemp Corporation,* 397 F.Supp. 871 (E.D.Pa. 1975); *Aamco Automatic Transmissions, Inc. v. McAlpine,* 391 F.Supp. 302 (E.D.Pa. 1975); *Goodman v. Fleischmann,* 364 F.Supp. 1172 (E.D.Pa. 1973). *FIRST*: Is the potential transferee forum one in which the plaintiff had the right to bring the action at the time that suit was commenced in the court which it in fact selected? and *SECOND*: Will a transfer further the interests of justice and the convenience of the parties, in light of all the competing public and private considerations which must be weighed? The second determination requires us to consider (1) plaintiff's choice of forum; (2) the relative ease of access to

---

**6.** The Ninth Circuit has applied the minimal contact analysis of *International Shoe* in applying the venue act Section 12 in this situation. *Courtesy Chevrolet, supra,* 344 F.2d at 865–866; *L. D. Reeder Contractors of Arizona v. Higgins Industries, Inc.,* 265 F.2d 768 (9th Cir. 1959); *Philadelphia Housing Authority, supra,* held that the minimum contacts test should not be used as a test of "doing business" under § 1391(b), but did not discuss the issue in relation to Section 12.

sources of proof; (3) the cost of obtaining attendance of willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive; (5) the responsibilities and difficulties of court administration, and, specifically in this case, the pendency of a related action in the transferee forum. *Goodman, supra,* at 1175; *Azriel, supra,* at 874, and cases therein cited.

■■■ Plaintiff has raised eight claims in its amended complaint: two are grounded upon federal and state antitrust laws; four find their genesis in various provisions of the federal securities laws; one arises under general fiduciary principles under state law; and, finally, a catch-all claim states that it is founded on "applicable state law".[7]

The facts material to the securities claims involve conduct of Humana in preparing the tender offer. The antitrust claims turn on facts material to the definition of the relevant product and geographical markets, and the likely impact of this potential merger on competition in the relevant markets. The potential breach of fiduciary duty arises out of the allegation that Humana's own current financial situation is such that it cannot finance the tender offer and hence, has a present intent to use Medicorp funds to accomplish that end if the offer is successful.

■■■ The securities claims, especially the *Third Claim* that the 14D–1 statement is misleading because of material omissions, have a close factual nexus with the fiduciary claims. Direct evidence of Humana's present intentions concerning the later use of Medicorp assets, and the evidence of the nature and scope of Humana's financial obligations, constitute the essential body of proofs which plaintiff must establish in or-

der to prevail on either claim. In contrast, the antitrust claims appear to have no common legal or factual nexus with the state and federal securities claims, and the state fiduciary claims; accordingly they will be treated separately in connection with the resolution of this motion.

**(1) COULD PLAINTIFF HAVE ORIGINALLY BROUGHT THIS ACTION IN THE SOUTHERN DISTRICT OF NEW YORK:**

**A. SECURITIES AND FIDUCIARY CLAIMS**

The venue requirements of the Securities Acts provide:

> [A]ny such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein . . . . 15 U.S.C. § 77v.

and

> [A]ny suit or action to enforce any liability or duty created by this chapter . . ., or to enjoin any violation of such chapter . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . . 15 U.S.C. § 78aa.

The amended complaint establishes on its face that New York is a proper forum for these claims, since the alleged material misrepresentations occurred there. See *United States v. Natelli,* 527 F.2d 311 (2d Cir.) *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Hence, it is abundantly clear that plaintiff could have brought the securities claims in the Southern District of New York.

---

**7.** The *Sixth Claim* (fiduciary claim), and the *Third Claim* (securities claim), are so enmeshed that they are in fact one ball of wax, should be treated so for venue purposes, and hence tried in a single forum. In this bitterly litigated matter in which there has been agreement on virtually nothing among counsel for the warring parties, even they conceded this point at oral argument held before the court on November 7, 1977. Furthermore, since jurisdiction for this state claim rests solely on its pendency to the securities claims, no basis exists to retain jurisdiction over this claim and so much of the *Eighth* catch-all Claim as is pertinent to it, because the securities claims were, in fact, transferred. See *Deaktor v. Fox Groceries,* 475 F.2d 1112 (3rd Cir.), *cert. denied* 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973).

**584**

### B. ANTITRUST CLAIMS

■ Plaintiff resists transfer of the antitrust aspect to New York, and claims that Humana could challenge venue there because Medicorp neither resides, is found, or transacts business in New York. We find this position specious, and indeed flies in the face of plaintiff's own contentions as to the validity of venue in this district. We previously concluded that the tender offer, in and of itself, represents a substantial transaction; the affidavit of Milton R. Ackman, on behalf of Humana establishing that the tender offer was primarily prepared in New York City, conclusively demonstrates that New York would have been equally as proper a forum for the federal antitrust claims as is this district.[8]

### (2) HAS THE MOVING PARTY SHOWN THAT "A BALANCING OF PROPER INTERESTS WEIGH IN FAVOR OF THE TRANSFER?" *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.), *cert. denied* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971).

### A. SECURITIES AND FIDUCIARY CLAIMS

Defendant's efforts to demonstrate that the interests of justice and the convenience of the parties outweigh plaintiff's choice of forum must be independently evaluated for each set of claims. We find that defendant has met its burden with respect to the securities and fiduciary claims, but has not done so in connection with the antitrust claims. Defendant's contentions as to the ease of access to sources of proof, the cost of obtaining witnesses, the practicalities of trial, and the overall convenience of the parties demonstrate that New York, on balance, is a more convenient forum for trial of the securities claims.

Plaintiff's *Third Claim* arises out of alleged misrepresentations and omissions in connection with the Schedule 14D–1. Defendant asserts, and opposing counsel do not deny, that the preparation of this document took place in New York City, that Lehman Brothers and its Managing Director, Frederick Frank, who are named as co-conspirators, reside in New York City, and that witnesses to these events will also be found in New York City. As a practical matter, New York is a more convenient forum for this claim, and also for the *Fourth Claim,* which alleges misuse of inside information by Frank and Humana.

Plaintiff's *Fifth Claim* alleges a similar misuse of inside information by the Continental Illinois National Bank and Trust Company of Chicago. Both New York and Pennsylvania appear to be equally inconvenient for the adjudication of this claim.[9] Plaintiff's *Sixth Claim* concerns Humana's intent to misuse Medicorp's assets if it gains control of the corporation. Humana's headquarters are located in Louisville, Kentucky, so that sources of proof, directly relevant to the *Sixth Claim,* are equally inconvenient to the two forums. Additional evidence relevant to the financial situation of Humana would also be found in Kentucky, or in Chicago or Boston, where the banks which are financing the purchase are located. (SEC FORM S–7 at 18 and 19). The factual and legal intertwining of these claims with the *Third* and *Fourth Claims* point to New York as the more convenient forum under the circumstances.

The *Seventh Claim* alleges that purchases of Medicorp stock on the New York Stock Exchange, prior to the September 27 public disclosure of the tender offer, violated the securities laws. The complaint does not state, nor do the parties discuss, the likely identity of the "tippees", the place or manner in which Humana allegedly made the wrongful disclosures, or any other facts relevant to the venue question. Discovery necessary to develop these matters, the al-

---

8. The parties have not discussed whether New York would have been a proper forum for the West Virginia state law claim. However, we need not make this determination in light of our conclusion, discussed *infra*, that this claim should be dismissed.

9. Plaintiff has also instituted a related action on October 18, 1977: *American Medicorp, Inc. v. Continental Illinois National Bank and Trust Co. of Chicago,* Civ. No. 7763865 (N.D. Ill.)

leged wrongful purchases, as well as the preparation of the tender offer there will take place in New York.

In weighing the factors necessary to decide the second question, we find that defendant has persuasively demonstrated that the convenience of the parties would be served by a transfer of the *Third* and *Fourth Claims*, and offered some independent basis for transfer of the *Seventh Claim*. An analysis of the securities and fiduciary claims as a whole, with specific attention to the legal and factual inter-relationships among them, leads us to conclude that the *Fifth, Sixth* and *Seventh Claims* must be tried in the same forum as the other securities claims.

We need not decide however, whether or not the above facts are sufficient to overcome the weight given to plaintiff's choice of forum. The pendency of a related case in New York clearly shifts the balance of interests in defendant's favor. *Blanning v. Tisch*, 378 F.Supp. 1058, 1061 (E.D.Pa.1974); see also, *Azriel*, at 874. Defendant filed an action in the Southern District of New York on September 30, 1977, alleging that Medicorp's statements of September 27 and 29, 1977, were false and misleading and in violation of the Securities Exchange Act of 1934, as amended (the Williams Act), 15 U.S.C. § 78n. Both Humana's New York claims and Medicorp's *Third Claim* directly arise out of, and directly relate to the propriety of the conduct of the tender offer as regulated by the Williams Act.

In *Piper v. Chris Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court stated the following in connection with the legislative history of the act:

The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings. Senator Williams articulated this singularity of purpose, even while advocating neutrality:

'We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bid. *S 510 is designed solely to require full and fair disclosure for the benefit of investors*'. 113 Cong.Rec. 24664 (Aug. 30, 1967) (remarks of Sen. Williams) (Emphasis supplied).

430 U.S. at 30, 97 S.Ct. at 944, 51 L.Ed.2d at 146, 147. (Emphasis in original).

The touchstone of any analysis of Williams Act claims must be the investors' interest in whether or not the information provided by the parties is fair and accurate. The single focus of the Williams Act is the protection of the investor; hence, to achieve this purpose, it is clearly desirable to have a single forum adjudicate the conflicting claims as to whether or not the investors have been, or could be, misled by the conduct of the purchasing and/or target corporations. Evidence of the materiality of the allegedly misleading statements will be dispositive of both claims; hence, adjudication by two courts would result in counter-productive overlapping legal and factual determination at the very least. Further, if the *Sixth Claim* were not tried by one court, we could conceivably find ourselves in the hopeless quagmire of each of two courts, separately and independently of the other, entering and supervising its own decree, a result which again would lead to overlapping at the very least, with conflicting directives also a distinct possibility.

Obviously, the best interests of the shareholders, the polestar of the Williams Act, require a single forum to supervise the correction of past material misinformation and oversee the ongoing tender offer process. See *Ronson, supra*, at 850. The combined factor of the close relationship of Medicorp's *Third Claim* to the New York action, the interlock between Medicorp's securities claim, and defendant's demonstration that New York will otherwise be a more convenient forum, outweigh plaintiff's choice of forum in this case. The *Third, Fourth, Fifth, Sixth* and *Seventh Claims* and applicable portions of the

**586**

*Eighth Claim* must be transferred to New York to accord with the interests of justice and the convenience of the parties.

### B. THE ANTITRUST CLAIMS

 The most that can be said in favor of defendant's allegations with respect to the antitrust claims is that neither forum is particularly convenient to it as a party, to ease of discovery, or to potential witnesses. Humana makes extensive use of professional service firms located in New York, but the situs of banks, law offices, and stock transfer agents has no apparent relation to a party's convenience in litigation which raises the issue of injury to competition, in the event a merger eventuates. In contrast, Medicorp's corporate headquarters is located in this district, and has been a vital nerve center in eliciting the proof needed in support of these claims. As neither Medicorp nor Humana operates in New York, it is unlikely that relevant evidence will be found in that jurisdiction; we note that defendant has been forthright with the court, and has not attempted to argue transfer of the antitrust claims on that basis.

Although the parties have not named the witnesses to be called, representations have been made to the court that heavy reliance will be placed on expert testimony. We cannot believe that these witnesses, who could have no more than an additional one and one half hour train ride from New York to Philadelphia, will be seriously inconvenienced. Also, there is neither a logical nor legal link between the likely effect on competition, if the merger occurs, and the allegedly misleading statements issued in Medicorp's press release, the basis for the New York action. Nor, as noted, do these claims bear any relationship whatsoever to the Medicorp securities claim which will be transferred to New York. Finally, neither New York or Pennsylvania courts have any special competence to adjudicate West Virginia state law claims. Humana simply has not demonstrated a sufficient basis to disturb plaintiff's choice of forum in connection with the antitrust claims.

### IV. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

### A. FIRST CLAIM: FEDERAL ANTITRUST VIOLATIONS

Defendant has prepared an assortment of complaints in support of its Motion to Dismiss the *First Claim* for the purported failure of that portion of the complaint to state a cause of action; that package is composed of the following objections: (1) lack of specificity with respect to the relevant product and geographical markets under § 7 of the Clayton Act, 15 U.S.C. § 18; (2) absence of allegations in the complaint sufficient to sustain a claim under § 1 or § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and (3) omission of allegations in the complaint sufficient to sustain a claim under § 8 of the Clayton Act, 15 U.S.C. § 19. We find these contentions to be utterly without merit.

 In *Hospital Building Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Supreme Court enunciated the principles which govern a determination with respect to the sufficiency of the complaint. Standing as we are at the threshold of the litigation, we must view the allegations in their totality. Thus viewed, the question then becomes whether or not, as a legal certainty, a court can state at that juncture that plaintiff cannot possibly prove a set of facts which would entitle it to relief. Given those criteria, it is clear that plaintiff has met the test. Plaintiff has alleged that lines of commerce exist in defined geographic areas in which there may be substantial harm to competition; proof of these allegations would establish a violation of § 7 of the Clayton Act. Plaintiff need not do more at this point. We are not dealing with motions for summary judgment based upon a record which has been adduced, nor are we dealing with findings of fact or conclusions of law after a trial; we are dealing only with the initial instrument which constitutes the framework for this litigation.

Defendant contends that plaintiff has not alleged the "magic words" of "contract, combination, or conspiracy in restraint of trade" or "monopolize or attempt to monopolize", in support of its § 1 and § 2 claims. This is not fatal to plaintiff's action. Notice pleading necessarily requires that a complaint be liberally construed. In *Bogosian v. Gulf Oil Corporation*, 561 F.2d 434 (3rd Cir. 1977), the plaintiff alleged "inter-dependent consciously parallel actions." In vacating the judgment of the district court which granted defendants' motions for summary judgment, the court stated:

> [P]laintiffs argue that the complaint fairly read as a whole alleges a "combination," and that such an allegation combined with a statement of the specific course of conduct alleged to be unlawful clearly states a claim. We agree. Id. at 445.

When the complaint is fairly read as a whole, as it must be, the thrust of the allegations are to charge defendant with a course of conduct violative of the Sherman Act, and therefore is sufficient to withstand the Motion to Dismiss.

Defendant also maintains that plaintiff has failed to state a claim under § 8 of the Clayton Act, 15 U.S.C. § 19. Section 8 prohibits interlocking directorates of competing corporations if elimination of competition between them by agreement would violate *any* of the antitrust laws.

Defendant intends to seek majority representation on plaintiff's board of directors after the acquisition of seventy five percent of the plaintiff's stock (SEC FORM S–7 at 16). In *United States v. Sears, Roebuck & Co.*, 111 F.Supp. 614 (S.D.N.Y.1953), the district court granted summary judgment against the defendant, ordering the resignation of a director from the board of one or both of two competitor corporations upon which he sat, because of a potential anticompetitive agreement.[10] In light of *Sears*, we hold that plaintiff has adequately stated a claim under § 8 of the Clayton Act.

B. SECOND CLAIM: STATE OF WEST VIRGINIA ANTITRUST VIOLATION

Defendant has also moved to dismiss plaintiff's *Second Claim* under the West Virginia Code, Chapter 61, Article 10, Section 19, the so-called "cornering the market" statute[11]. Its thesis is that no private right of action is created by this criminal statute, and that the law applies only to *goods* and not to services. Our independent research discloses no cases construing the statute; the parties have not cited any case to us, in either their voluminous briefing or at the extensive session granted for oral argument. We will grant the motion to dismiss. We agree with defendant that this state statute cannot even remotely serve as a basis for relief under the facts in this case.

> It shall be unlawful for any person or body of persons buying or selling any foodstuffs, fuel or any article or articles pertaining to necessities of life, either in his individual capacity or as an officer, agent, or employee of a corporation, or a member of a partnership, to store any such foodstuffs, fuel, article or articles for the purpose of cornering the market price thereof, or for the purpose of limiting the supply thereof to the public, whether temporarily or otherwise. Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred nor more than one thousand dollars and, may, in the discretion of the court, be confined in the county jail not exceeding one year. (1917, 2nd Ex. Sess., c. 14; Code 1923, c. 15D, § 97).

10. [w]hat Congress intended by § 8 was to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates. The legislation was essentially preventative.

\* \* \* \* \* \*

While it may be acknowledged that the clause is not crystal clear, to infuse it with the meaning contended for by the defendants would defeat the Congressional purpose "to arrest the creation of trusts, conspiracies and monopolies in their incipiency and before consummation." This conclusion is compelled because of the futility of trying to decide whether a given hypothetical merger would violate the pertinent sections of the antitrust laws. *Sears, supra,* at 616–617. (Footnotes omitted).

11. Chapter 61, Article 10, Section 19 provides:

■ Finally, we dispose of the second head of this motion which seeks, in the alternative, a more definite statement. Defendant urges, *inter alia*, that the complaint is so vague and ambiguous that it cannot frame a responsive pleading. We hold that plaintiff has adequately complied with F.R. C.P. 8(a) and the mandate of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "the defendant [be given] fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47, 78 S.Ct. at 103. Whatever gaps may have existed in defendants' knowledge of the basis of the complaint in connection with its ability to file a responsive pleading, have certainly been cured by the thousands of documents that have been produced and the plethora of oral deposition testimony taken pursuant to the entry of the order for expedited discovery by this court on October 13, 1977. Indeed, proof of defendant's ability to file a responsive pleading was vividly demonstrated by the answer which was filed on November 7, 1977.

For these reasons, defendant's motions to dismiss, and, in the alternative, for a more definite statement, are denied as to the *First Claim*, and granted as to the *Second Claim*.

CONCLUSION:

For the reasons set forth in this opinion, we confirm the orders previously entered as of October 28 and November 7, 1977, and will enter a consolidated order as of this date embodying the substance of the former orders effective as of the date of entry of those orders.

ORDER

AND NOW, this 11th day of November, 1977, it is ORDERED that:

1. Plaintiff's Motion to File an Amended Complaint is DENIED for mootness;
2. Defendant's Motion to Transfer to the United States District Court for the Southern District of New York, in which the related case of *Humana, Inc. v. American Medicorp, Inc.*, 77 Civ. 4809, is pending before the Honorable Morris E. Lasker, shall be, and is, hereby disposed of as follows:

 a. FIRST CLAIM, alleging violations of the United States antitrust laws—DENIED;

 b. SECOND CLAIM, alleging violations of the West Virginia "Cornering Market" law—DENIED;

 c. THIRD CLAIM, alleging a plan to obtain control of the plaintiff's Board of Directors in violation of the federal securities laws—GRANTED;

 d. FOURTH CLAIM, alleging violations of federal securities laws and Delaware law by the abuse of material, non-public information—GRANTED;

 e. FIFTH CLAIM, alleging violations of the federal securities laws by the abuse of material, non-public information—GRANTED;

 f. SIXTH CLAIM, alleging future breach of fiduciary duty—GRANTED;

 g. SEVENTH CLAIM, alleging violations of Sections 10 and 14 of the Securities Exchange Act of 1934—GRANTED;

 h. EIGHTH CLAIM, alleging violations of applicable state law—GRANTED to the extent applicable to the THIRD, FOURTH, FIFTH, SIXTH and SEVENTH CLAIMS:

3. Defendant's Motion to Dismiss is DENIED as to the FIRST CLAIM; the Motion to Dismiss is GRANTED as to the SECOND CLAIM; and the Motion to Dismiss is DENIED as to the THIRD, FOURTH, FIFTH, SIXTH and SEVENTH CLAIMS (as being moot before this Court in light of paragraph two of this Order) without prejudice to defendant's right to present this motion to the Honorable Morris E. Lasker, United States District Court Judge for the Southern District of New York;

4. The alternative Motion for a More Definite Statement of the FIRST CLAIM is DENIED.